# United States Tax Court

T.C. Memo. 2023-20

SCOTT MOORE AND GAYLA MOORE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 18632-19.                                    Filed February 23, 2023.

————

*Mark Chandler Goldenberg*, for petitioners.

*Britton G. Wilson* and *Stephen A. Haller*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, *Judge*:  Respondent determined deficiencies in petitioners' income tax of $68,263 for 2014 and $141,945 for 2015. Petitioner Gayla Moore was the sole owner of Nevco, Inc. (Nevco), a subchapter S corporation, during those years.  Nevco claimed the section 41[1] credit for increasing research activities (research credit) on its 2014 and 2015 Forms 1120S, U.S. Income Tax Return for an S Corporation. This credit flowed through to petitioners' individual income tax returns for 2014 and 2015.

Mr. Robert was Nevco's president and chief operating officer (COO) during 2014 and 2015.  After concessions, the issue for decision is whether (and if so to what extent) Nevco is entitled to a research credit under section 41 for compensation paid to Mr. Robert during 2014 and

———

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]** 2015. We hold that (1) Mr. Robert did not engage in direct supervision or direct support (as provided by section 41(b)(2)(B)(ii)) of persons who performed qualified services during 2014 and 2015 and (2) even though he was extensively involved in new product development, the record does not show the portion of Mr. Robert's work on new product development which meets the requirements of "qualified research" under section 41(b)(2)(B)(i). Thus, Nevco cannot consider Mr. Robert's wages in computing the research credit for 2014 and 2015.

## FINDINGS OF FACT

A.    *Petitioners*

Mrs. Moore was the sole owner and chief executive officer of Nevco in 2014 and 2015.[2] Nevco manufactures scoreboards for high school and college athletic events, as well as LED video displays, score tables, and other types of equipment for indoor and outdoor sports venues. Mrs. Moore's husband, Scott Moore, was the vice president of strategic initiatives of Nevco during those years. Petitioners resided in Florida when the Petition was filed.

B.    *Nevco Personnel*

1.    *Mr. Robert*

Mr. Robert was a software engineer early in his career. He later was chief information officer at an electronics firm, vice president at another electronics company where he focused on manufacturing initiatives, manufacturing consultant at an international accounting firm, and manufacturing consultant at his own consulting firm.

Mr. Robert was an independent consultant at Nevco from 2004 to 2006 and an employee from 2006 to 2016. When he arrived at Nevco in 2004, the company was losing market share because Nevco's product line had fallen behind those of other companies. From 2004 to 2006 he advised petitioners on Nevco's personnel and inventory requirements and sometime before 2014 he reorganized the entire staff. He held the position of COO from 2006 to 2016 and was president and COO during 2014 and 2015. During all those years he reported to Mrs. Moore. The Moores wanted Mr. Robert to focus on new product development. As a

---

[2] Mr. Moore testified that Mrs. Moore's ownership of the stock was through a trust, but the parties stipulated her direct ownership and we so find.

**[*3]** result, Mr. Robert spent 50%–65% of his time working on new product development.[3]

Mr. Robert's base compensation was $85,092 in 2014 and $178,956 in 2015.  He also received (1) a "senior management bonus" of $253,285 in 2014; and (2) a total bonus of $1,890,137 in 2015, comprising $222,162 as a "senior management bonus" and $1,667,975 as an "additional bonus."  The "additional bonus" was based on Nevco's increase in enterprise value as measured by a multiple of EBITDA (earnings before interest, taxes, depreciation, and amortization) over a four-year period.  Mr. Robert could strive to increase the value of Nevco in any way; thus, he was not limited to achieving that goal by performing research or developing new products.  In 2014 and 2015 he was the only Nevco employee to receive an additional bonus tied to growth in the value of Nevco.

The management of Nevco operated informally in many ways. The high level of trust and informality that existed among Nevco's top management is illustrated by the fact that the formula for Mr. Robert's additional bonus was never written even though it potentially involved substantial amounts of money.  Neither Mr. Robert nor anyone at Nevco kept records of his activity or the amount of time he spent on any particular project.  Mr. Robert did not report his activity or time allocation to any other Nevco employee.  No one at Nevco maintained documents during 2014 and 2015 detailing any of the officers' or employees' responsibilities and duties.

As president, Mr. Robert was responsible for the entire company. Mrs. Moore managed many of the company's financial initiatives, and Mr. Moore supervised most of the marketing and sales initiatives.  Their assistance enabled Mr. Robert to focus his attention on overseeing Nevco's operations and new product development during 2014 and 2015.

Mr. Robert's office was in the building across the street from the factory where the engineering department was located during 2014 and 2015.  Dave Paslay was the director of engineering at Nevco, and he reported to Mr. Robert.  During those years Mr. Paslay and Mr. Robert had weekly project update meetings that lasted from one to three hours. At those meetings Mr. Paslay updated Mr. Robert on the engineers' progress on various projects at Nevco.  The discussions were extremely detailed.  The front-line engineers did not attend those meetings.  Mr.

---

[3] As discussed below, the parties dispute this percentage.

[*4] Paslay and Mr. Robert also met in each other's office daily or almost daily, sometimes more than once daily, during 2014 and 2015.

### 2. *Other Senior Staff*

The members of senior management during 2014 were Messrs. Robert, Paslay, Phalan, Schulte, and Winkler. Mr. Robert chaired and set the agenda for the weekly meetings of that group. No one kept written minutes for any of the meetings conducted at Nevco during 2014 and 2015. The chief financial officer (CFO) of Nevco was Dan Phalen in 2014 and Chad Schnarre in 2015.[4] Jeffrey Schulte was the purchasing manager, and Ed Caperton was the quality and service manager. In 2015 Mike Lane was vice president of sales, Mike West was plant manager, Cheryl Corte was supervisor of shipping and receiving, and Mr. Winkler was large project supervisor.[5] Mr. Robert directly supervised those individuals.

### 3. *Engineering Department*

Mr. Paslay was the direct supervisor of the six to ten engineers in Nevco's engineering department during 2014 and 2015. Mr. Paslay supervised the engineers' work on new product design, the development and improvement of existing products and the manufacturing processes for those products. During 2014 and 2015 Mr. Robert was the direct supervisor of Mr. Paslay and the second-level supervisor of the other engineers in the engineering department. Mr. Robert was not a member of the engineering department.

The engineers engaged in qualified research during 2014 and 2015.[6] Some of Nevco's engineers did not have a college degree in engineering. Engineering department employees did not record how they spent their time during 2014 and 2015.

---

[4] The organizational chart names Mr. Phalen as CFO during May 2015; however, the parties stipulated and we find that Mr. Schnarre was CFO throughout 2015.

[5] The organizational chart says Mr. Winkler was director of new product development, but the parties stipulated and we find that he was large project supervisor. Exhibit 6–J spells his name "Winkeler," but Exhibit 7–J spells it (and we find it is) "Winkler."

[6] The parties stipulated this fact.

[*5] C.     *New Products Under Development in 2014 and 2015*

Mr. Robert contributed to Nevco's new product development during 2014 and 2015 through his numerous meetings with Mr. Paslay and his visits to the engineering department and manufacturing area. Five of those products are discussed next.

1.     *Scoreboard Truss*

A scoreboard truss is a structure or extension above the scoreboard with visible girders to which personalizing items may be added, such as school or team logos, names, and mascots. Nevco historically purchased pre-engineered trusses from third parties. This practice resulted in lost sales due to lead times and the costs of the pre-engineered trusses. Mr. Robert concluded that Nevco could manufacture scoreboard trusses in house. As a result Nevco developed this capability and subsequently introduced larger trusses into its truss product line. He developed processes to design the trusses, and to build them using aluminum and Nevco's existing equipment. Mr. Robert worked with members of the engineering department to help ensure that Nevco's trusses were durable and feasible for Nevco to manufacture. Through an experimental process, Mr. Robert, Mr. Paslay, and the engineering staff developed technology for these new scoreboard trusses which enabled them to withstand winds up to 180 miles per hour.

2.     *Scorbitz*

Scorbitz is a Nevco product that transmits scoreboard information, such as the score and time remaining, to interested users' personal devices. Mr. Robert was extensively involved with the development of Scorbitz. Mr. Robert was project leader for Scorbitz until 2014 or 2015. The engineers, including Mr. Paslay, focused on the technical aspect of what could be done. Mr. Robert directed the engineering staff toward a design that Nevco could build which provided value to potential customers and would be marketable. In addition, he defined expectations for how the product would function.

Mr. Robert used his programming background to assist with development of the database, which was an important part of the project. He worked with the engineers to develop database technology that could transfer scoreboard information to the cloud and back to user devices. Mr. Robert, Mr. Paslay, Mr. Moore, and one other individual were named on the Scorbitz patent issued March 15, 2016. In 2014 or

[*6] 2015 Mr. Moore supplanted Mr. Robert as project leader for Scorbitz. Mr. Moore's role was primarily customer-facing and Mr. Robert remained focused on product development.

### 3. *New Caney Ribbon Board*

The New Caney Ribbon Board is an LED display that extends 276 feet along both sides of the New Caney, Texas, high school stadium. It can be programmed to show various images, such as the current score and advertisements. Nevco's New Caney ribbon board was a prototype. At the outset of the project, Mr. Robert defined the requirements of the product. As the project progressed, he participated in product development by sharing his ideas and suggesting modifications to how the user would operate the ribbon. It was essential that the ribbon board be affordable for small colleges and high schools and that one person be able to operate it. Mr. Robert's ideas and technical suggestions were important in achieving these design objectives.

### 4. *MPCX–2*

The MPCX was a hand-held device used to operate Nevco's scoreboards. The product was popular among customers, but interference problems arose when several MPCX devices were operated near one another. At some time during 2014 and 2015 Mr. Robert decided that the MPCX had to be redesigned in order to eliminate the interference. The second version of the MPCX, the MPCX–2, was designed by a team coordinated by Mr. Robert to eliminate this problem.

Mr. Robert was the leader of the MPCX–2 project. He made all the decisions but delegated certain tasks including supplier selection and circuit board design to the procurement and engineering departments. Nevco employees administered a barrage of tests to identify components to be obtained from third parties for installation by Nevco on the circuit board. Both Mr. Robert and Mr. Paslay participated in testing the components under consideration. The test results were used by the engineering department in designing a circuit board that could use the chosen component.

### 5. *Slim Shot Clock*

When Mr. Robert became president of Nevco, the company had produced the same bulky shot clock for several years. That shot clock had protruding LEDs which could be damaged by errant basketballs.

[*7] Mr. Robert proposed a new design, the Slim Shot Clock, and instructed his subordinates to begin building prototypes in house.

The prototypes employed different configurations for LED viewing angles, impact resistance, plexiglass type, and structural materials. Mr. Robert instructed the manufacturing and procurement departments to build approximately 20 prototypes before ultimately selecting a design that he believed was satisfactory. Designing the Slim Shot Clock was an iterative process with many designs, experiments, and failures. Each decision to reject a prototype was made by Mr. Robert.

D.     *Tax Returns*

Petitioners filed their 2014 and 2015 joint income tax returns on Forms 1040, U.S. Individual Income Tax Return. Nevco filed its 2014 and 2015 income tax returns on Forms 1120S. Nevco claimed research credits on those returns, which flowed through to petitioners' individual income tax returns for 2014 and 2015. Nevco used the base period 1984 to 1988 to calculate the fixed-base percentage for its 2014 regular research credit. Nevco used the alternative simplified credit method to calculate its 2015 research credit. An accounting firm prepared petitioners' Forms 1040 and Nevco's Forms 1120S for both 2014 and 2015.

OPINION

A.     *Introduction*

After concessions,[7] we must decide whether (and if so to what extent) Nevco may take into account compensation paid to Mr. Robert, Nevco's president and COO during 2014 and 2015, in computing Nevco's research credit for those years. That in turn requires that we decide whether Mr. Robert was engaged (1) in performing "qualified services," *see* § 41(b)(2)(B)(i), or (2) in direct supervision or direct support of persons who performed qualified services during 2014 and 2015, *see* § 41(b)(2)(B)(ii).

---

[7] Respondent concedes that Nevco is entitled to the research credit for wages paid to personnel in Nevco's engineering department, including Mr. Paslay.

**[\*8]**   1.   *Section 41*

Section 41(a) establishes the method for computing the research credit.  § 38(b)(4).  A taxpayer's qualified research expenses include "in-house research expenses" "which are paid or incurred by the taxpayer during the taxable year in carrying on any trade or business of the taxpayer."  § 41(b)(1)(A).  A taxpayer's "in-house research expenses" include "any wages paid or incurred to an employee for qualified services performed by such employee."  § 41(b)(2)(A)(i).  Section 41(b)(2)(A) includes as wages "all remuneration . . . for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash."  *See* §§ 41(b)(2)(D)(i), 3401(a).  An employee performs "qualified services" by either "(i) engaging in qualified research, or (ii) engaging in the direct supervision or direct support of research activities which constitute qualified research."  § 41(b)(2)(B).

2.   *Time Spent by Mr. Robert on New Product Development*

Petitioners contend that Nevco properly counted 65% of Mr. Robert's compensation in computing the research credits for 2014 and 2015.  Respondent contends petitioners have not adequately proven that percentage.

Mr. Robert testified that he spent two thirds or more of his time working on new product development in 2014 and 2015.  He also said he spent "well north of 50%" on new product development.  His testimony was substantially corroborated by the credible testimony of Mr. Moore and Mr. Paslay.  In challenging that claim respondent properly relies on the total lack of written records showing how Mr. Robert used his time.  Respondent also points out that, as president, Mr. Robert had many other duties.  But we are satisfied that with the assistance of petitioners, who handled substantial duties that would otherwise have been performed by Mr. Robert, Mr. Robert spent from 50% to 65% of his time on new product development during 2014 and 2015.  However, as discussed below, the precise percentage does not affect the result because not all of Mr. Robert's work on new product development was qualified services.

B.   *Whether (and if so to What Extent) Mr. Robert Engaged in Qualified Research*

Under section 41(d), four requirements must be met in order for an activity to be "qualified research."  First, the research expenditures

**[*9]** must be eligible to be treated as expenses under section 174. § 41(d)(1)(A).  Under section 174(a)(1), "[a] taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account."  Those "expenditures so treated shall be allowed as a deduction."  § 174(a)(1).  Treasury Regulation § 1.174-2(a)(1) defines "research or experimental expenditures" as "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense."

Second, the research must be undertaken to discover information which is "technological in nature."  § 41(d)(1)(B)(i).  Third, the application of that research must be "intended to be useful in the development of a new or improved business component of the taxpayer." § 41(d)(1)(B)(ii).  Fourth, "substantially all of the activities of" the research must "constitute elements of a process of experimentation for a purpose" related to "a new or improved function," "performance," or "reliability or quality."  § 41(d)(1)(C), (3)(A).  Section 41(d)(4) provides a list of activities that are specifically excluded from the definition of qualified research.

Treasury Regulation § 1.41-4(a)(5)(i) defines "process of experimentation" as "a process designed to evaluate one or more alternatives to achieve a result where the capability or the method of achieving that result, or the appropriate design of that result, is uncertain as of the beginning of the taxpayer's research activities." Treasury Regulation § 1.41-4(a)(5)(i) also provides that a process of experimentation

> involves the identification of uncertainty concerning the development or improvement of a business component, the identification of one or more alternatives intended to eliminate that uncertainty, and the identification and the conduct of a process of evaluating the alternatives (through, for example, modeling, simulation, or a systematic trial and error methodology).

Treasury Regulation § 1.41-4(a)(4) provides as follows regarding the use of technology in the process of experimentation:

> For purposes of section 41(d) and this section, information is technological in nature if the process of experimentation

**[*10]** used to discover such information fundamentally relies on principles of the physical or biological sciences, engineering, or computer science. A taxpayer may employ existing technologies and may rely on existing principles of the physical or biological sciences, engineering, or computer science to satisfy this requirement.

The parties dispute whether (and if so, to what extent) Mr. Robert performed qualified services in 2014 and 2015 by engaging in qualified research; that is, whether or to what extent his work met these four requirements, and he thus performed qualified research during those years. As stated above, not all of Mr. Robert's work on new product development is qualified research, and thus, all of that work cannot be considered in computing the credit. Petitioners seem to acknowledge this point. They state in their opening brief that "at least some" of Mr. Robert's work on new product development was qualified research. More specifically, in their opening brief petitioners state that "[t]he testimony presented at trial supports the proposition that at least some of the activities in which Mr. Robert engaged in during 2014 and 2015 as part of Nevco's new product development were 'qualified research' as defined under section 41(d)(1)."

Unfortunately from petitioners' standpoint, the record provides at best little on which to base a finding regarding the portion (i.e., the number of hours) of his work on new product development which was qualified research. The record provides no estimates of the amount of time Mr. Robert spent on qualified research as distinguished from the broader category of new product development.

On the truss project, he received (primarily from Mr. Paslay) descriptions of the engineers' progress and he specified the requirements for the product. Those activities were not qualified research (i.e., were not research applying technology in an experimental process). His work with the engineers to identify a design that would perform well in high winds may have involved qualified research, but our record does not show how much time he spent on that activity.

For the Scorbitz project, Mr. Paslay testified that the engineers knew "the technical aspect of everything that could be done." Mr. Robert urged finding the value for the customer, and he guided the concept into something that would be marketable. He was also instrumental in developing the requirements for the product. That activity was not qualified research (i.e., was not research applying technology in an

[*11] experimental process). On the other hand, he was involved in the technical details of programming how the scoreboard data would get to the cloud and back to users' phones. That work may have constituted qualified research, but our record does not show how much time Mr. Robert spent doing these things.

His work on Scorbitz led to his name with three others from Nevco being included on a patent. This fact supports petitioners' position here. *See Fudim v. Commissioner*, T.C. Memo. 1994-235, 1994 WL 223280, at *12 (finding that the contemporaneous award of two patents supported the taxpayer's claim to a research tax credit under section 41). However, we may not overlook evidence suggesting that some of his work on Scorbitz was not qualified research or estimate with no basis in the record the amount of time he spent on activity which may have been qualified research.

For the New Caney Ribbon Board, he defined product requirements (e.g., that it be affordable by likely customers and operable by one person) and made technical suggestions important to achieving these goals. He led the MPCX–2 project and participated in testing components to be used on the MPCX–2 circuit board. He proposed the design for the new Slim Shot Clock and directed subordinates to build prototypes, approximately 20 of which he rejected before accepting the final version. Even if some of his activity on these three products was qualified research, we have no basis for estimating how much of his time was so spent. Thus, petitioners may not take any of the compensation paid to Mr. Robert into account under section 41(b)(2)(B)(i) for directly engaging in qualified research.

C.     *Direct Supervision and Direct Support*

We next consider whether petitioners may take any of the compensation paid to Mr. Robert into account under section 41(b)(2)(B)(ii) ("engaging in the direct supervision or direct support of research activities which constitute qualified research").

1.     *Direct Supervision*

Petitioners contend that Mr. Robert directly supervised qualified research conducted by Mr. Paslay and Nevco's other engineers by chairing weekly senior management meetings and by working daily on new product development with Mr. Paslay. We agree that Mr. Robert presided over those meetings and met with Mr. Paslay. However, those activities do not constitute "engaging in the direct supervision . . . of

[*12] research activities" under Treasury Regulation § 1.41-2(c)(2), which provides:

> The term "direct supervision" as used in section 41(b)(2)(B) means the immediate supervision (first-line management) of qualified research (as in the case of a research scientist who directly supervises laboratory experiments, but who may not actually perform experiments). "Direct supervision" does not include supervision by a higher-level manager to whom first-line managers report, even if that manager is a qualified research scientist.

Mr. Paslay, not Mr. Robert, was the first-line manager of personnel in the engineering department. Under that regulation, Mr. Robert does not qualify as the direct supervisor of staff subordinate to Mr. Paslay in the engineering department. Mr. Robert directly supervised Mr. Paslay during the relevant period; that is, he was the "higher-level manager" to whom Mr. Paslay reported. As quoted above, Treasury Regulation § 1.41-2(c)(2) specifically excludes from the definition of direct supervision "supervision by a higher-level manager to whom first-line managers report." Thus, Mr. Robert did not perform qualified services through his direct supervision of Mr. Paslay.

## 2. *Direct Support*

Petitioners argue that Mr. Robert performed qualified services by providing "direct support" of persons performing qualified research. The regulations under section 41(b)(2)(B)(ii) provide that the term "direct support" includes services in the direct support of either "[p]ersons engaging in actual conduct of qualified research" or "[p]ersons who are directly supervising persons engaging in the actual conduct of qualified research." Treas. Reg. § 1.41-2(c)(3). Treasury Regulation § 1.41-2(c)(3)(ii) provides as examples of direct support a secretary "typing reports describing laboratory results derived from qualified research," a laboratory worker "cleaning equipment used in qualified research," and a machinist "machining a part of an experimental model used in qualified research." Mr. Robert did not provide direct support as that term is used in the regulations.[8] Thus, wages paid to Mr. Robert may

---

[8] The examples in the regulations are very similar to those in legislative history accompanying the enactment of a predecessor of section 41(b)(2)(B)(ii) in the Economic Recovery Tax Act of 1981. S. Rep. No. 97-144, at 80 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 105, 185; H.R. Rep. No. 97-201, at 117 (1981), *as reprinted in* 1981-2 C.B. 352, 361.

**[\*13]** not be taken into account in computing the credit under section 41(b)(2)(B)(ii).

D.    *Conclusion*

Upon due consideration of the foregoing, petitioners may not consider any wages paid to Mr. Robert in computing Nevco's section 41 research credit for 2014 or 2015.

To reflect the foregoing,

*Decision will be entered under Rule 155.*